IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| CHRISTINE CLOSE, <br><br> Plaintiff, <br><br> v. <br><br> CAROLYN W. COLVIN, *in her capacity as Acting Commissioner of the Social Security Administration*, <br><br> Defendant. | MEMORANDUM DECISION AND ORDER <br><br><br> Case No. 1:12-cv-134-EJF <br><br> Magistrate Judge Evelyn J. Furse |

Plaintiff Christine Close filed this action asking this Court to reverse or remand the final agency decision denying her Disability Insurance Benefits ("DIB") and Social Security Income ("SSI") under Titles II and XVI of the Social Security Act, *see* 42 U.S.C §§ 1381–1383f (2010). The Administrative Law Judge ("ALJ") determined that Ms. Close did not qualify as disabled within the meaning of the Social Security Act. (Admin. R. Doc. 15, certified copy tr. of R. of admin. proceedings: Christine R. Close (hereinafter "Tr. __").) Based on the Court's careful consideration of the record, the parties' memoranda, and relevant legal authorities, the Court AFFIRMS the Commissioner's decision.[1]

**PROCEDURAL HISTORY**

In September 2008, Ms. Close filed for DIB and SSI alleging an onset date of disability of December 1, 2005. (Tr. 15.) The Regional Commissioner denied Ms. Close's claims on November 17, 2008, and upon reconsideration on May 5, 2009. (*Id.*) At Ms. Close's request, a

---

[1] Pursuant to Civil Rule 7-1(f) of the Rules of Practice for the United States District Court for the District of Utah, the Court concludes it does not need oral argument and will determine the appeal on the basis of the written memoranda.

hearing before an ALJ took place on July 19, 2010 (the "Hearing"). (*Id.*) On September 21, 2010, the ALJ issued a decision (the "Decision") denying Ms. Close's claims. (Tr. 12–32.) On November 22, 2010, Ms. Close requested the Appeals Council review the ALJ's Decision. (Tr. 148.) The Appeals Council denied Ms. Close's request on May 15, 2012, (Tr. 1–6), making the ALJ's Decision the Commissioner's final decision for purposes of judicial review under 42 U.S.C. section 405(g). *See* 20 C.F.R. § 404.981.

## FACTUAL BACKGROUND

At the time of the Hearing, Ms. Close was 55 years old. (Tr. 20.) Ms. Close alleges she has suffered physical problems since age 12 and that a September 2004 automobile accident in which she injured her neck exacerbated those problems. (*Id.*)

In March 2003, Ms. Close consulted Dr. Wesley Lewis at Valley West Rehabilitation ("Valley West"). Ms. Close complained of chronic musculoskeletal pain dating to her twenties and noted she "quit taking meds in 20's as they didn't help." (Tr. 314.) One and a half years later, in August 2004, Ms. Close complained of chronic pain and a history of bone spurs. (Tr. 313.) Dr. Lewis prescribed Lortab. (*Id.*)

On September 22, 2004, Ms. Close returned to Valley West reporting she had been involved in a rear-end automobile collision. (Tr. 312.) Dr. Lewis described Ms. Close as suffering no apparent distress, with normal range of motion. (*Id.*) Dr. Lewis diagnosed Ms. Close with cervical strain and prescribed Flexeril, a muscle relaxant. (*Id.*)

On November 18, 2004, Ms. Close—on Dr. Lewis's referral—underwent a magnetic resonance imaging exam ("MRI"). (Tr. 317–18.) The radiologist, Dr. Steven Hunt, reported the cervical spinal cord was normal in signal intensity and contour and identified no abnormalities, edema, or evidence of either epidural or paraspinal hemorrhage. (*Id.*) Dr. Hunt described the

C2-3 and C7-T1 levels of the spine as normal. (*Id.*) Dr. Hunt reported mild disc space narrowing and dessication at C4-5 with no focal disc herniation. (*Id.*) He also noted the possibility of a subacute facet fracture but found no nerve root compression or displacement. (*Id.*) Finally, Dr. Hunt identified mild degenerative changes at C5-6 and C6-7 with no focal disc herniation, or spinal or foraminal stenosis. (*Id.*)

On November 26, 2004, Radiologist Steven Souza, M.D., performed a computed tomography scan ("CT") of Ms. Close's cervical spine. (Tr. 326.) Dr. Souza noted a non-displaced fracture of the inferior aspect of the left C4 facet and of the superior corner of the left C5 facet but found no other evidence of acute bone injury. (*Id.*)

On December 9, 2004, Ms. Close sought care from Dr. William Muir for persistent neck and left-sided arm pain. (Tr. 319–21.) Dr. Muir's examination notes indicate Ms. Close had a reduced range of motion and that she reported pain with palpation. (*Id.*) Dr. Muir performed a manual muscle test on Ms. Close, on which she scored 5 out of a possible 5 in both upper extremities. (*Id.*) Dr. Muir also noted Ms. Close's earlier CT scan showed a fractured facet joint and some instability at the C4-5 level. (*Id.*) Dr. Muir administered a facet injection on Ms. Close's left side of C4-5. (*Id.*) Ms. Close had another facet injection and block at C4-5 on December 21, 2004—this time from Dr. Ronald Ruff. (Tr. 328.)

In March, June, October, and December of 2005, Ms. Close visited Dr. Lewis. Dr. Lewis's June records show he gave Ms. Close a note "re disabled neck 9/4/05 to 3/31/05 for insurance purposes." (Tr. 341.) An entry dated October 11, 2005, notes "neck doing well." (Tr. 340.) Dr. Lewis also noted complaints of elbow and leg pain and that Ms. Close was involved in arbitration with her insurance provider. (*Id.*) In December 2005, Ms. Close complained of weekly migraines; she took over-the-counter medications and Midrin on a trial basis. (*Id.*)

Ms. Close again visited Dr. Lewis in February, May, August, and September 2006. (Tr. 337–39.) Ms. Close continued to complain of pain in May 2006 but had a fair range of motion. (Tr. 339.) In August, Ms. Close complained of increased pain and more headaches. (Tr. 338.) Dr. Lewis administered injections of Kenalog and Xylocaine and instructed Ms. Close to continue with stretching exercises. (*Id.*) He also refilled Ms. Close's Flexeril prescription. (*Id.*) On October 2, 2006, Dr. Lewis referred Ms. Close to a hand and wrist surgeon and recorded his belief she had cervical spondylosis with nerve impingement. (Tr. 333.) No prior documentation of Dr. Lewis's supports or documents this conclusion. (Tr. 286–95, 312–14, 332–43, 432–54, 465–73, 498–501, 506–08.)

Dr. Lewis's records show Ms. Close applied for Medicaid in early 2007 and that Ms. Close had not sought assistance from Workforce Services. (Tr. 336.) Dr. Lewis's records also show Midrin worked well for her headaches. (*Id.*)

Although Ms. Close complained to Dr. Lewis of having pain on April 19, 2007, Dr. Lewis observed that Ms. Close had no apparent distress and her examination showed good cervical flexion. (Tr. 335.) Dr. Lewis again diagnosed cervical spondylosis with radiculopathy despite the absence of findings from an MRI or CT scan. (*Id.*)

On Dr. Lewis's recommendation, Ms. Close had a second cervical spine MRI on June 14, 2007. (Tr. 315–16.) The radiologist, Dr. John N. Henrie, reported that Ms. Close's cervical cord remained normal in both signal and morphology. (*Id.*) Dr. Henrie also noted evidence of a prior fusion at the C4-5 level but found no neural impingement at that or any other level of the cervical spine. (*Id.*) Dr. Henrie also identified mildly degenerated discs at the C5-6 and C6-7 levels, noting mild disc bulge at each level and marginal osteophyte formation but no cord or neural

impingement. (*Id.*) Dr. Lewis prescribed Ms. Close physical therapy in June 2007, noting the new MRI showed mild disc degeneration without herniation. (Tr. 332.)

Canyon Rim Physical Therapy initially evaluated Ms. Close on August 16, 2007, noting cervicalgia with decreased mobility. (Tr. 426.) After the initial evaluation, Ms. Close participated in physical therapy from September 2007 to January 2008. (Tr. 351–62.) On October 10, 2007, Ms. Close visited Dr. Lewis complaining of neck pain and migraine headaches; she also stated she had not completed physical therapy. (Tr. 440.) Ms. Close reported at her last visit, on January 30, that her neck felt better. (Tr. 351.) Ms. Close's physical therapist, Julie Thieszen, suspected Ms. Close had not complied with the physical therapy program, because Ms. Close could not demonstrate the exercises involved. (Tr. 351–54.)

On March 19, 2008, Dr. Jonathan Burns and Dr. Michael Giovanniello at the Smart Clinic evaluated Ms. Close as a new patient. (Tr. 424–25.) Ms. Close complained of neck and left-arm pain at a 5 out of 10. (Tr. 424.) She also reported a history of chiropractic adjustment on her neck. (*Id.*) The examination described no acute distress and non-antalgic gait with a slightly decreased cervical spine range of motion on extension and rotation. (Tr. 424–25.) The exam also noted slight give-way on manual muscle testing of Ms. Close's right arm but normal strength in the left. (*Id.*) The doctors diagnosed Ms. Close with axial cervical pain with left radicular symptoms and recommended epidural steroid injection ("ESI") of the cervical spine to ease her progression into regular work. (*Id.*) The doctors recommended several sessions of physical therapy with an eventual transition to a home exercise program. (*Id.*) The doctors left the door open to electrodiagnostic testing of the arm to determine the extent of possible cervical radiculopathy. (*Id.*) In accordance with the treatment plan, Ms. Close had her first cervical ESI

on April 11, 2008, at the C7-T1 level. (Tr. 423.) At a follow up visit on May 15, 2008, Ms. Close reported the ESI gave her one to two days of pain relief. (Tr. 421–22.)

On July 2, 2008, Ms. Close again complained to Dr. Lewis of migraine headaches; Dr. Lewis never ordered any tests to determine the cause of the migraines. (*See* Tr. Tr. 286–95, 312–14, 332–43, 432–54, 465–73, 498–501, 506–08.) Ms. Close returned to Drs. Burns and Giovanniello on August 27, 2008, complaining of pain at a 6 on a scale of 10. (Tr. 419–20.) Drs. Burns and Giovanniello recommended a second ESI and physical therapy but no pain medication. (*Id.*) On September 17, 2008, Ms. Close returned to Dr. Lewis with the same complaints. (Tr. 435.) Dr. Lewis provided her Lortab, Flexeril, Midrin, and Phenergan. (*Id.*) Ms. Close saw Dr. Lewis with the same complaints in December 2008. (Tr. 436.) Ms. Close reported going to school for twelve hours per week. (*Id.*) Dr. Lewis refilled her Lortab, Flexeril, and Phenergan prescriptions. (*Id.*)

Ms. Close returned to Dr. Burns's office six months later, on February 26, 2009, at which time Dr. Michael Giovanniello prescribed her Voltaren pain gel and performed a series of myofascial trigger point injections. (Tr. 417–18.) On April 15, 2009, Ms. Close reported to Dr. Lewis that she felt "just miserable" and that her most recent injections had not provided any relief. (Tr. 434.) Dr. Lewis again refilled prescriptions for Lortab and Flexeril. (Tr. 433.) Ms. Close returned to Dr. Giovanniello on April 29, 2009, reporting some relief from the myofascial trigger point injections and asking for a second round, which Dr. Giovanniello performed. (Tr. 416.)

On July 6, 2009, Ms. Close had an office visit with Dr. Lewis because of neck pain; Dr. Lewis noted her intention to ask Dr. Giovanniello for more injections. (Tr. 472–73.) Ms. Close visited Dr. Giovanniello in September 2009, and Dr. Giovannielo received her usual complaints

and noted she sat on the examination table in no acute distress and that her neurological examination remained unchanged. (Tr. 457.) Dr. Giovanniello planned a third set of myofascial trigger point injections at Ms. Close's request. (*Id.*)

Ms. Close returned to Dr. Lewis on October 12, 2009, reporting she still attended school, resting between classes, and that she had been denied food stamps because she was a student. (Tr. 468–69, 471.) Ms. Close saw Dr. Lewis again on January 14, 2010, to "fill out paperwork." (Tr. 465–67.) Dr. Lewis noted no significant changes in her leg and neck pain. (*Id.*) Dr. Lewis noted she had no apparent distress, despite complaints of arm, leg, and neck pain. (*Id.*) Medications at this time included Flexeril, Lortab, and Phenergan. (*Id.*)

On February 19, 2010, Ms. Close received a physical therapy evaluation at McKay-Dee Hospital. (Tr. 483–86.) Physical therapist Jennifer Kimball listed Ms. Close's short term goals as active compliance with a home exercise program and pain reduction. (Tr. 483.)

Ms. Close has past relevant work as an escort, DOT 359.367-010. From 2005 to 2007, Ms. Close earned $3,287.00, $3,900.00, and $6,354.00, respectively. (Tr. 197.) During that time, Ms. Close served on-call for eight hours each day but only received compensation for time actually spent with a client. (Tr. 54.) Ms. Close spent her on-call time at home and chose which calls to accept. (Tr. 55–56.) This decision depended on how she capable she felt. (*Id.*)

## STANDARD OF REVIEW

42 U.S.C. section 405(g) provides for judicial review of a final decision of the Commissioner of the Social Security Administration ("SSA"). The Court reviews the Commissioner's decision to determine whether the record as a whole contains substantial evidence in support of the Commissioner's factual findings and whether the SSA applied the correct legal standards. 42 U.S.C. §405(g); *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).

The Commissioner's findings shall stand if supported by substantial evidence. 42 U.S.C. § 405(g).

Adequate, relevant evidence that a reasonable mind might accept to support a conclusion constitutes substantial evidence, and "[e]vidence is insubstantial if it is overwhelmingly contradicted by other evidence." *O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir. 1994). The standard "requires more than a scintilla, but less than a preponderance." *Lax*, 489 F.3d at 1084. "Evidence is not substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion." *Gossett v. Bowen*, 862 F.2d 802, 805 (10th Cir. 1988) (internal quotation marks and citations omitted). Moreover, "[a] finding of 'no substantial evidence' will be found only where there is a conspicuous absence of credible choices or no contrary medical evidence." *Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir. 1992) (internal quotation marks and citations omitted).

Although the reviewing court considers "whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases," the court "will not reweigh the evidence or substitute [its] judgment for the Commissioner's," *Lax*, 489 F.3d at 1084 (internal quotation marks and citations omitted), but "review only the *sufficiency* of the evidence," *Oldham v. Astrue*, 509 F.3d 1254, 1257 (10th Cir. 2007) (emphasis in original). The court does not have to accept the Commissioner's findings mechanically, but "examine the record as a whole, including whatever in the record fairly detracts from the weight of the [Commissioner's] decision and, on that basis, determine if the substantiality of the evidence test has been met." *Glenn v. Shalala*, 21 F.3d 983, 984 (10th Cir. 1994) (internal quotation marks and citation omitted). "'The possibility of drawing two inconsistent conclusions from the

evidence does not prevent an administrative agency's findings from being supported by substantial evidence,'" and the court may not "'displace the agenc[y's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'" *Lax*, 489 F.3d at 1084 (quoting *Zoltanski v. FAA*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

In addition to a lack of substantial evidence, the Court may reverse where the Commission uses the wrong legal standards or the Commissioner fails to demonstrate reliance on the correct legal standards. *See Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994); *Thomson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993); *Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1047 (10th Cir. 1993).

## **ANALYSIS**

The Social Security Act ("Act") defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Moreover, the Act considers an individual disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

In determining whether a claimant qualifies as disabled within the meaning of the Act, the SSA employs a five-part sequential evaluation. *See* 20 C.F.R. § 404.1520; *Williams v. Bowen*, 844 F.2d 748, 750–53 (10th Cir. 1988); *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987). The analysis evaluates whether:

(1) The claimant presently engages in substantial gainful activity;
(2) The claimant has a medically severe physical or mental impairment or impairments;
(3) The impairment is equivalent to one of the impairments listed in the appendix of the relevant disability regulation which preclude substantial gainful activity;
(4) The impairment prevents the claimant from performing his or her past work; and
(5) The claimant possesses a residual functional capacity to perform other work in the national economy considering his or her age, education, and work experience.

*See* 20 C.F.R. § 404.1520. The claimant has the initial burden of establishing the disability in the first four steps. *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir. 1989). At step five, the burden shifts to the Commissioner to show the claimant retains the ability to perform other work existing in the national economy. *Id.*

The ALJ evaluated Ms. Close's claim through step four, making the following findings of fact and conclusions of law with respect to Ms. Close:

1. "[Ms. Close] meets the insured status requirements of the Social Security Act through September 30, 2012." (Tr. 17.)
2. "[Ms. Close] has not engaged in substantial gainful activity since June 1, 2005, the amended alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*)." (*Id.*)
3. "[Ms. Close] has the following severe impairments: cervical degenerative disc disease, leg pain and headaches. (20 CFR 404.1520(c) and 416.920(c))." (*Id.*)
4. "[Ms. Close] does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)." (Tr. 18.)
5. "[S]ince the amended alleged onset date [Ms. Close] has had at least the residual functional capacity to perform the full range of unskilled light work as defined in 20 CFR 404.1567(b) and 416.967(b), except that such work could not require: Lifting more than 5-10 pounds and lifting and carrying more than 3-5 pounds on no more than an occasional (from very little up to 1/3rd of the day) basis; Standing or walking more than 6 hours in an 8 hour day; Sitting more than 2 hours in an 8 hour day; But, regarding sitting and standing/walking, [Ms. Close] must have the option to change postures briefly every 20 minutes for maximum comfort; Overhead lifting and reaching on more than a "less than occasional" basis; Reaching, handling and fingering (and no feeling) on more than an occasional basis; Preclusion of the option, while seated, to elevate the legs at chair seat height; Fine dexterity, e.g. no watch repair like tasks;

>   Sustained flexion or extension of the neck and no significant twisting of the neck." (Tr. 19.)
> 6. "[Ms. Close] is capable of performing past relevant work as an Escort, DOT 359.367-010 as usually performed in the national economy in reduced numbers. This work does not require the performance of work-related activities precluded by [Ms. Close's] residual functional capacity (20 CFR 404.1565 and 416.965)." (Tr. 27.)
> 7. "[Ms. Close] has not been under a disability, as defined in the Social Security Act, from December 1, 2005, through the date of this decision (20 CFR 404.1520(f) and 416.920(f))." (*Id.*)

In short, the ALJ concluded Ms. Close did not possess an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, that she had the residual functional capacity to perform past relevant work as an Escort and the full range of unskilled light work as defined in the Act from the alleged onset date through the date of the Decision. (Tr. 17–27.)

In support of her claim that this Court should reverse the Commissioner's decision, Ms. Close argues the ALJ erred: (1) by refusing to classify as severe Ms. Close's transitional syndrome and depression at step two of the sequential evaluation process; (2) by rejecting Ms. Close's subjective complaints; (3) by rejecting the opinion of Ms. Close's treating medical provider; and (4) by failing to conduct a proper step four analysis. The Court addresses each argument in turn.

## I. Rejection of Impairments at Step Two

Ms. Close argues the ALJ erred at step two of the sequential evaluation process by not finding transitional syndrome and depression to rise to the level of severe impairments. Ms. Close argues transitional syndrome and depression do constitute severe impairments because they "cause significant functional limitations and, therefore, are not groundless complaints." (Pl.'s Opening Br. 13, ECF No. 16.)

Step two of the sequential evaluation process requires the ALJ to decide whether the claimant has a severe impairment. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment or combination of impairments qualifies as severe when it significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a). If the ALJ does not find at step three that the claimant's impairment or impairments meets or equals a listing in appendix 1, the ALJ continues at step four to determine the claimant's residual functional capacity. 20 C.F.R. § 404.1520(a)(4)(iii)–(iv). In determining residual functional capacity, the ALJ considers all medically determinable impairments, including non-severe impairments. 20 C.F.R. § 404.1545(a)(2). Because the ALJ considers both severe and non-severe impairments at later steps, any failure to designate additional severe impairments at step two qualifies as harmless if the ALJ finds at least one severe impairment and continues with the sequential evaluation process. *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008); *Brescia v. Astrue*, 287 F. App'x 626, 629 (10th Cir. 2008).

Here, the ALJ found at step two of the sequential evaluation process that Ms. Close had severe impairments consisting of "cervical degenerative disc disease, leg pain and headaches." (Tr. 17.) Having found Ms. Close possessed these severe impairments, the ALJ continued with the sequential evaluation process. (Tr. 17–27.) Because the ALJ found severe impairments at step two and continued with the sequential evaluation process, any error at step two qualifies as harmless.

## II. Rejection of Ms. Close's Subjective Complaints

Ms. Close next argues substantial evidence does not support the ALJ's determination of her credibility. (Pl.'s Opening Br. 13–17, ECF No. 16.) The Court disagrees.

"'Credibility determinations are peculiarly the province of the finder of fact, and [a court] will not upset such determinations when supported by substantial evidence.'" *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (quoting *Diaz v. Sec'y of Health & Human Servs.,* 898 F.2d 774, 777 (10th Cir.1990)). "However, '[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.'" *Id.* (quoting *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988)). If objective medical evidence shows a medical impairment that produces pain, the ALJ must consider the claimant's assertions of severe pain and decide the extent to which the ALJ believes the claimant's assertions. *Id.* (citation omitted). But this analysis "does not require a formalistic factor-by-factor recitation of the evidence. So long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility, the dictates of *Kepler* are satisfied." *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).

The ALJ examined Ms. Close's pain complaints in turn. (Tr. 24–25.) For each such complaint, the ALJ set forth whether the record contains any objective medical evidence to support the complaint and provided specific reasons for the credibility accorded Ms. Close's pain complaints. (*Id.*) Initially, the ALJ discounted Ms. Close's subjective complaints of pain because Ms. Close produced insufficient objective medical evidence to support her claims. (*Id.*) For example, the ALJ noted Ms. Close complained of pain in her knees and right ankle but "produced no evidence of any examination or x-ray of either joint in the record since 2003." (Tr. 24.) The ALJ noted a similar lack of evidence with regard to Ms. Close's complaints of neck pain, right-leg bone spurs, migraines, and difficulty lifting more than two pounds. (Tr. 24–25.) The ALJ also noted that despite Ms. Close's complaints related to bone spurs she developed in her right leg at age 21, that condition apparently did not prevent Ms. Close from working

between then and age 49. (Tr. 24.) Moreover, the ALJ noted Ms. Close provided inconsistent testimony when she stated she had problems lifting more than two pounds, only to later state she could "carry a gallon of milk, but 'bending is the issue.'" (Tr. 24.) An ALJ may consider a claimant's inconsistent statements in weighing credibility. *See Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005) (noting "an ALJ may engage in ordinary techniques of credibility evaluation, such as considering . . . inconsistencies in claimant's testimony"); 20 C.F.R. § 404.1529(c)(4).

Because the ALJ set forth specific evidence to support the determination of Ms. Close's credibility, this Court finds no error in the ALJ's rejection of Ms. Close's subjective complaints. *See Qualls*, 206 F.3d at 1372.

### III. Evaluation of Treating Physician Opinion Evidence

Ms. Close argues the ALJ erred by rejecting the opinion of her treating medical provider, Dr. Lewis, because the ALJ did not provide a legitimate reason for rejecting Dr. Lewis's opinion. (Pl.'s Opening Br. 17–20, ECF No. 16.) The Court disagrees.

An ALJ must evaluate every medical opinion. 20 C.F.R. § 404.1527(c). If the ALJ finds a treating physician's opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [] not inconsistent with the other substantial evidence in [the] case record," the ALJ must give the opinion controlling weight. 20 C.F.R. § 404.1527(c)(2). When the ALJ does not give a treating physician's opinion controlling weight, the ALJ must consider certain factors. 20 C.F.R. section 404.1527(c) provides these factors:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*See Watkins v. Barnhart*, 350 F.3d 1297, 1300–01 (10th Cir. 2003) (citation omitted). To reject a medical opinion, the ALJ must provide "'specific, legitimate reasons.'" *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001) (quoting *Miller v. Chater,* 99 F.3d 972, 976 (10th Cir. 1996)).

Yet the ALJ's decision need not *discuss explicitly* all of the factors for each of the medical opinions. *See Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (stating that a lack of discussion of each factor does not prevent the court from according the decision meaningful review). When considering medical opinion evidence, the ALJ must weigh and resolve evidentiary conflicts and inconsistencies. *See, e.g.*, *Eggleston v. Bowen*, 851 F.3d 1244, 1247 (10th Cir. 1988) (reflecting ALJ's resolution of evidentiary conflicts between medical providers).

Here, the ALJ did not accord controlling weight to Ms. Close's treating medical provider's opinion. Instead, the ALJ's decision provided specific, legitimate reasons for granting "very limited weight" to Dr. Lewis's opinion. (Tr. 26–27.) First, the ALJ noted that Dr. Lewis's responses to the Residual Functional Capacity Questionnaire substantially contradicted the evidence in Dr. Lewis's treatment records. (Tr. 26.) The Decision notes, by way of example, that Dr. Lewis provided no explanation or objective evidence for his conclusions that Ms. Close could walk two minutes at a time without a break and stand fifteen minutes at a time. (Tr. 26.) Moreover, the ALJ noted Dr. Lewis left blank the narrative explanation portion of the questionnaire. (*Id.*) *See* 20 C.F.R. § 404.1527(c)(3) ("The better an explanation a source provides for an opinion, the more weight we will give that opinion."); *Frey v. Bowen*, 816 F.2d 508, 515 (10th Cir. 1987) (noting that check-box style reports, absent "thorough written reports or persuasive testimony, are not substantial evidence"). In giving Dr. Lewis's opinion limited

weight, the ALJ noted Dr. Lewis is neither an orthopedist nor a neurologist (Tr. 26)—relevant here because specialists' opinions related to their areas of specialty generally receive greater weight. 20 C.F.R. § 404.1527(c)(5).

The ALJ also "recognize[d] the possibility that a doctor may express an opinion in an effort to assist a patient with whom he sympathizes" and that "[w]hile it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as is the case here." (Tr. 27.) Although an ALJ may reject a medical provider's opinion based on such non-medical factors, *see* SSR 06-03p (Aug. 9, 2006) (allowing ALJ to consider other factors that tend to support or contradict his opinion when determining how much weight to accord a medical opinion), substantial evidence must support those factors, *see Drapeau*, 255 F.3d at 1214. While the ALJ's decision does not provide substantial evidence to support the rejection of Dr. Lewis's opinion on this score alone, as discussed above, the ALJ provided other specific, legitimate reasons for according limited weight to Dr. Lewis's opinion evidence. Accordingly, this Court finds no error.

### IV. RFC Consideration

The RFC reflects the ability to do physical, mental, and other work activities on a sustained basis despite limitations from the claimant's impairments. *See* 20 C.F.R. §§ 404.1545, 416.945. The step four analysis involves three phases:

> In the first phase, the ALJ must evaluate a claimant's physical and mental residual functional capacity (RFC), and in the second phase, he must determine the physical and mental demands of the claimant's past relevant work. In the final phase, the ALJ determines whether the claimant has the ability to meet the job demands found in phase two despite the mental and/or physical limitations found in phase one. At each of these phases, the ALJ must make specific findings.

*Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003) (citation omitted). Ms. Close argues the ALJ erred in assessing her RFC by not making the necessary findings at each phase of the RFC analysis. The Court disagrees.

Ms. Close first argues the ALJ erred at phase one of step four by finding Ms. Close's transitional syndrome and depression as non-severe, rejecting Ms. Close's testimony, and rejecting her treating-medical-provider testimony. (Pl.'s Opening Br. 21, ECF No. 16.) As a result, Ms. Close argues, the ALJ's RFC finding did not include all of Ms. Close's functional limitations. (*Id.*)

The Court has already addressed these arguments elsewhere and found they lack merit. *See supra* pp. 13–16. Substantial evidence supports the ALJ's decision to grant little weight to Ms. Close and Dr. Lewis's testimony. Although the ALJ found Ms. Close's transitional syndrome and depression non-severe, the ALJ's decision considered all symptoms in determining Ms. Close's RFC. (Tr. 19.) Moreover, because transitional syndrome is sufficiently similar to degenerative disc disease—which the ALJ found constitutes a severe impairment—the ALJ's analysis accounted for Ms. Close's transitional syndrome. Finally, Ms. Close did not allege any mental impairment before the ALJ. Accordingly, this Court finds no error at phase one.

Ms. Close next argues the ALJ erred at phase two by failing to identify all specific demands of Ms. Close's past relevant work; namely, "walking, the need to please clients by appearing pleasant and not showing pain, the physical demands of keeping clients from inappropriately touching her, etc." (Pl.'s Opening Br. 22, ECF No. 16.) The ALJ's decision states:

> The claimant is capable of performing past relevant work as an Escort, DOT 359.367-010 as usually performed in the national economy in reduced numbers.

> This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.95).
>
> She performed her past relevant work at the light exertional level which is consistent with her current residual functional capacity and other limitations, but the best fit to the above stated RFC is to find that she can perform a limited number of escort jobs in the national economy.

(Tr. 27.) The ALJ's finding that Ms. Close performed her past relevant work at the light exertional level, together with the specific reference to the DOT definition, suffices at phase two. *See, e.g.*, *Parise v. Astrue*, 421 F. App'x 786, 789 (10th Cir. 2010) (finding statement that claimant can perform past relevant work with reference to the DOT category sufficient under phase two).

Ms. Close similarly argues the ALJ erred at phase three by not providing a sufficiently detailed explanation and by relying on an incomplete hypothetical. (Pl.'s Opening Br. 22, ECF No. 16.) These arguments fail. As part of the step four analysis, the ALJ accounted for Ms. Close's limitations by reducing the number of jobs available to her by 30%, in accordance with the Vocational Expert's testimony. (Tr. 27.) Ms. Close argues the ALJ posited an incomplete hypothetical to the Vocational Expert because the ALJ gave very limited weight to Ms. Close's medical providers. However, an ALJ's credibility determination should assist in assessing a claimant's RFC. *See Poppa v. Astrue*, 569 F.3d 1167, 1171 (10th Cir. 2009) ("Since the purpose of the credibility evaluation is to help the ALJ assess a claimant's RFC, the ALJ's credibility and RFC determinations are inherently intertwined."). Because substantial evidence supports the ALJ's credibility findings, s*ee supra* pp. 14–16, the ALJ committed no error.

## **CONCLUSION**

Based on the foregoing, the Court finds that substantial evidence supports the Commissioner's decision and AFFIRMS the Commissioner's decision in this case.

DATED this 28th day of September, 2013.

BY THE COURT:

_____
Evelyn J. Furse
United States Magistrate Judge